My name is Chris Dove, attorney for Cenikor Foundation, the appellant in this case. Cenikor is a licensed drug rehab facility. It operates according to the therapeutic community model, which requires peer pressure used in the best possible way. And when people come to Cenikor, they're looking to get sober and not to get a job. You come not to Cenikor's HR department, you come to intake and detox. Cenikor wants you to get sober so that you can move on with a sober life. It has a limited time program tailored to the needs of each patient and their sobriety. Cenikor doesn't want you to stay indefinitely. It wants you to move on with your life and leave the facility for sober living. And when you come to Cenikor, after you have detoxed, if you arrive stoned, you sign a series of forms where they explain how this program is going to work to you. You attest in these forms, I have a substance abuse problem. I'm willing to help others with their substance abuse problems because this is a peer-driven program. You agree that you are a volunteer, a beneficiary of the services that are being provided to you, and you are not an employee. You were told that you will have to work as part of your therapy and that you will not receive cash wages as a result of that work. You were told that this work therapy, if it is for a community business partner outside the facility, that Cenikor will receive money from that community business partner, and that it will be used to partially offset the cost of providing the services. Cenikor does not make a profit. It is a non-profit organization. The money it receives from its community business partners does not equal the amount of money it spends helping people get sober. By emphasizing all these points, what's the test that you're emphasizing? That they agreed they were not employees. Would you agree that argument is foreclosed from Alamo Foundation? That what the parties agreed to, you can't waive your FLSA rights? There were several questions there, Judge Higginson, and I'll answer all of them in order, if I may. I believe that the test that's applied is the test of Alamo, and it is a test that has been understood by all of the circuit courts that follow it and apply. They're not changing it, but every one of those circuit courts has come out in the way that Cenikor would prefer, because what they have found in every one of these circumstances is that Alamo says, the first question, whether you are an FLSA employee at all, whether the protections apply in the first place, depends on the question of whether you expected compensation or instead acted. Is it expected compensation, or did you receive compensation in kind? An expectation of compensation is the quote from Walling v. Portland Terminal that they use, and that is the quote that has been used by every circuit court that follows. So, for instance, you pointed out that what Williams does is it says, this is a threshold question. If you performed without expectation of compensation, but instead for your own personal purpose. I thought, I'm just getting you wrong, because I thought sort of it's referred to as the economic realities test, and if that's correct, if you don't work, are you kicked out? I think the answer here is yes. That's not correct. Not correct? It's much more subtle than that, and I'd like to answer that more fully if I may. And again, you're asking all of what I would prefer the court to be asking, so let me answer in order if I may. Yes, it is called the economic or personal purpose. This depends on the economic realities of the situation. You must look to the totality of the circumstances in every case. And Judge Ellison says here, whether or not that's a question that can be answered collectively, because that's the decision. It isn't whether these people are or aren't employees. It's whether or not collectively that question can be answered, right? That is true, though I would say in response that there's two parts to that answer. You're exactly right. We're here on a certification decision, but the first question is, did Judge Ellison use the right test to determine if it could be collectively certified? And then, was that certification decision correct if you apply the proper legal standard? What Judge Ellison did here was he said, basically, I'm going to apply the test that this court uses for independent contractors, which is something like 90-something percent of FLSA disputes about what an employee is, but it's not relevant here. He said, I'm going to use that test because the Fifth Circuit has never given me a different test to apply in the context of drug rehab patients. Well, that's why we're here. The court needs to speak on that, just as every one of these other circuit courts has spoken on it. That was a mistake, well, out of deference to Judge Ellison. He wasn't unaware of Alamo, I call it Alamo, but maybe I'm wrong, Alamo Foundation, and that unanimous case seems to map on pretty closely, right? There, it isn't an independent contractor, it's allegedly a rehab, but here, the economic reality could easily be characterized as a staffing agency in as much as you are getting a huge amount of money from Walmart, and in exchange, the patients get in-kind housing and board. Isn't that essentially Alamo? The reason I call it Alamo is that the rather extraordinary... I'm sure you're right, I'm just not going to... Okay, Alamo. I'll see if I can say, yeah, I don't need to be correct. But I guess the question is... Just as I understand, yes, why isn't this case governed by Alamo? The answer is because this is a drug rehab facility where the people here were working for the purposes of sobriety. What the court found in Alamo was that this was essentially what they call a religious commune. It's frequently been called a cult. What these people are doing is they are having to labor in exchange for the benefits that they receive. That's what the district court found and the Supreme Court found was not a clearly erroneous factual determination, because what happened there is you went to stay with the Alamo Foundation's facility. You were told that you must work to eat. If for any reason you did not work, you were ill, you injured yourself, you don't eat. By the same token, the harder you work for the for-profit businesses owned by Tony Alamo, the more benefits you receive from there. You got a better place to stay or whatever. Under these circumstances, where the district court went affidavit by affidavit through 155 separate affidavits from the people that were there and said what we see here is that this was performed in exchange for it is a true quid pro quo. I'm not here to say that the facts of Alamo were wrongly decided by the Supreme Court, but I am here to say that this is a very different situation. It is not a quid pro quo. It is not that if you don't work, you're kicked out. I would describe it this way. You arrive, and for a period of 30 to 60 days, you don't work at all. The focus is on getting you sober, getting you ready to adapt to this program, learning life skills, learning how this is going to work. You receive all of the benefits that are being discussed here without working a the primary phase where you were expected to do work of some kind. It may be work for a community partner. It may be work within the facility. You don't have to work and gain profit, according to their allegations. They say you should disregard that fact because they've carefully defined their certified class who will admit anybody who chose to work inside the facility, but we think it's relevant to show the way that it works. Here, unlike the Alamo Foundation case, if you are in the facility and you are injured, you spend six, seven weeks being treated for hepatitis C, as one of the plaintiffs was. You don't lose your benefits. You receive the same benefits you received in the first phase of the program. During this time, if you change work to a different type of, if you work in-house rather than out of the house, you still receive all of the benefits that you would receive. Nothing has changed except that we add work to it. They like to say that if you don't work, you would be kicked out, but this is not the same sense that this religious commune operated in its very brutal and sad circumstances in the 1970s. I'm in a big hurry to hear what happens if you don't work because you keep saying if you don't work, you don't get kicked out. What happens if you don't? The testimony of Mr. Pullman, who is the CFO, and this is in the record, he explains that what happens is you sit down and you talk with the counselors and they say, what's the problem? Is it that you are having trouble adapting to work? Because many of the people that come to Synagogue are coming from a situation where they haven't worked in a long time. We try to find a way to help them adapt to working for a living again or trying to find a way of developing those life skills because to graduate, you're going to have to hold down a job. If that is a question where you're having a dispute with your particular employer, can we find you a different employer that you won't have this agitation with? But it is absolutely true. Part of the therapeutic community process requires you to work. You cannot not work and lead a meaningful sober life according to the therapeutic community model. So if at the end of the day you say it's not that I have an objection to this, I just will not work. How many conversations does it reveal how often it is? But there is an opportunity that's given where you're talking, tell me why this is. Why don't you want to work? Can we find you a different job? I got that part. Then it's presented to you. Being in this program is contingent on working in-house or out-of-house and so you'll have to leave. They reserve the right and I want to be absolutely candid about this. The documents do say that for any infringement of the rules of the program, we reserve the right to make you leave and probably one of those reasons would be refusing to work. But the record doesn't reveal and I am not aware of any circumstance where somebody has said I refuse to work and so they were just kicked out of the program. It's something that has to be dealt with and I think it's fundamental to the entire reason you came to Cinecor in the first place. Why did you come to a program that makes work the heart of the sobriety process if you don't want to work? And if you don't like the work that you're asked to do to build life skills, maybe you want to become an electrician as several of the plaintiffs in this case did. They got skills toward becoming an electrician. Maybe that's not what you wanted. You're free to leave. The door's not locked. You are here to become certain. The argument we buy into the idea that work is essential for sobriety, how does the overtime in particular play into that? What does the therapeutic model say about those who are working towards sobriety needing to work or having to work even more than a 40-hour work week? There's no policy of the program that requires overtime work. What happens, what the record reveals is that if a worker works more than 40 hours in a week, the contract with the community business partner says the compensation you're going to give back to Cinecor involves time and a half like it would for any other worker. Any other worker, somebody that applied to, for instance, the electrical company on their own and said, I want to work here. If they work more than 40 hours a week, you pay them time and a half. That's because the Department of Labor's tests for these sorts of programs are very clear about you can't be working at some advantage to other workers. What Cinecor has to do is react on a level playing field. So if for some reason a worker works more than 40 hours a week, they have to be treated in the same way that an independent non-sobriety program worker would be overtime. In fact, my understanding is that the records show that they routinely work something like 30 hours a week. This is not a recurring, overwhelming problem. If it were, plaintiffs would have had the obligation to prove it with record evidence, and they've not done so. What you end up with at the end of the day is a program that recognizes the value of work, but just like the decisions in Armento and Vaughn, where they said the fact that you work doesn't mean that you were working in exchange for the benefits provided. The benefits are part of the program overall, and the work is part of the program overall. Armento is the case that, again, that I would urge this court to review carefully. It's a program that had to do with law that follows FLSA law. All of the case discussion goes back to federal FLSA cases. In this circumstance, Mr. Armento was required to work as part of his work program because that is what the therapy for these homeless veterans involved, and they had to develop life skills where they can contribute to society again. He said, I believe I should have been paid wages for that, and the Fourth Circuit said, no. First of all, they said the independent contractor test, which was what was applied by Jardellison in this case, doesn't make any sense here. There's no dispute about employee versus independent contractor. We need to be looking back at this fundamental test stated in Olamo and applied by every circuit court since then, the same one for interns, the same one for trainees, and here for people that are working for their own personal pleasure. Not incarcerees. You're not drawing an analogy to incarcerees. No. I believe there's enough distinctions with incarcerees, although it does illustrate a one-size-fits-all. Just in seconds left, though, just two quick questions. Do you have a quick record site, and would you say that you had preserved your offset argument in front of Keith Ellison? Yes. What's the record site for that? Our reply brief states the record site for that. I don't have it, and if I sit down, I will get it, and I will hand it to you. Okay, and what's your best authority for your privacy argument? The Doe case. The case that ... Thank you, counsel. Good morning, Your Honor. Mr. Porcellino? Yes, sir. You may proceed. Thank you. Good morning. May it please the court. Josh Porcellino for the Apple East. In this case, the district court correctly rejected Senate CORE's arguments in opposition to certification using the economic realities test set forth under Tony and Susan Alamo. Under Alamo, the test for employment is objective, and here all collective members shared the same economic reality. Specifically, all of them signed the same paperwork stating that Senate CORE would provide them with all of their basic needs and that they had to participate in Senate CORE's work program to receive these in-kind benefits. All of them lived at Senate CORE's facilities. All were subject to the same Senate CORE policies. All worked as directed by Senate CORE, and none were paid for their work during the primary phase. Senate CORE also received substantial and immediate advantages from this work program. Senate CORE held itself out as a staffing agency with better employees than other contracts with third-party businesses stated that its workers were presumed to be non-exempt from laws requiring overtime pay. Senate CORE's policies put its own interest in maximizing revenue ahead of those it was purporting to treat. Senate CORE charged overtime premiums to all of its customers every time a worker worked more than 40 hours in a week, and thus the more hours its patients worked, the more revenue Senate CORE generated. As a result of these policies, Senate CORE received more than $19 million from its clients for the work performed by the participants in the three years from 2017 to 2020. In light of these objective facts, it can be determined whether all collective members were employees or not. This is a clear example of a case where collective certification was warranted. In Alamo, the Supreme Court found that all 300 participants in a religious non-profit work association were employees of the FLSA. In reaching this conclusion, the Alamo Court observed that the associates had been entirely dependent upon the foundation for long periods of time and that those participants had expected and received in-kind benefits, which were simply wages in another form. Do you remind me, in Alamo, did Justice White describe the test he was applying as an economic reality test? He did use the word economic. So, in your mind, all the different categories of problematic people, incarcerees, trainees, patients, independent contractors, whether or not they're entitled to labor law protection turns on the economic reality. We don't need to modify it. Your Honor, whether interns should be subject to a different test, I think that's an issue for another day. Our position is that in the context of rehabilitation programs, the economic realities test set forth under Alamo is the appropriate test. There's a rehabilitative purpose that one might say is primary here, and there's really no issue of control in the independent contractor employer, like who's paying. There's just a lot of differences. Correct, Your Honor. Let me turn that into a question. Would you lose if we followed the model its whole program around? Your Honor, the problem with the Williams case is that it does not follow Alamo's command to examine the extent to which the... So, you think the dissent is right there? Judge Poole's dissent? The dissent in Williams? Yes. Yes, sir. We do not believe that the Williams court properly followed Alamo's command to examine the economic dependence on the entity. So, to briefly go back to why Alamo ties into this case and dictates the same result here. Here, or in Alamo, the long period of economic dependence by the program participants was significant because it created the inference that workers must have expected something in return for their work, namely the in-kind benefits on which they survived. Similarly here, the program participants were entirely dependent upon Senecor for all of their needs for 18 to 24 months. They labored for third-party clients of Senecor as directed by Senecor in return for room, board, and other necessities. They did not have permission or time to work outside of Senecor. Indeed, Senecor's policies dictated that they couldn't even possess their own money while at Senecor. You will not find a case where there is more economic dependence of an employee on an employer than this one. This dependence strongly suggests that the plaintiffs expected in-kind compensation in return for their work because they otherwise had no means of providing for themselves. The fact that members of the collective here shared this same economic morality supports the district court's conclusion that they shared common dispositive questions of law and fact that can be determined collectively. We, Judge Ellison and ourselves, no one's answering this question. It's just, am I right? It's just whether all of them face the same circumstances so that the merits question could be answered. That's right, your honor. As much as Senecor wants to jump to the merits of the of the case and argue the merits of the case, the test is not whether who wins or loses the employer-volunteer issue. It's just whether that issue can be determined collectively. And the economic reality, the evidence of these participants' economic realities was the same. They all signed the same paperwork. They all lived under the same policies and procedures. Typically, in a swales case, you're going to have the defendant arguing that certain positions may have been, you know, may have performed different job duties, that different facilities applied policies differently, different locations, you know, there's individualized factors. We don't have that because Senecor CFO admitted our policies apply uniformly to all facilities. And he also admitted that none of the, that all of the paperwork was the same. This is not like swales where there were, you know, 25 different contracts. Is Senecor arguing, did the district court address when you say there's no individualized aspect to this, were some of the plaintiffs working by virtue of court order or not? Is that irrelevant? Some, some were working by court order. Okay, is that problematic for the collective consideration? Your honor, the only way I believe that could come into play would be under the Rooker-Feldman, on this Rooker-Feldman doctrine. Is that being argued by Senecor? That is argued by Senecor. I can address that now. Well, I was just, you know, on whether there are individualized carve-outs. So, so, so the way the, the court appointment comes into play is that there has, has been an argument by Senecor that because these people were appointed, were sent to Senecor by court order, that the Rooker-Feldman doctrine applies. We believe it does not. It can't, the Rooker-Feldman doctrine cannot prevent certification because it has no application here. The Rooker-Feldman doctrine, as the court knows, is a very limited doctrine after the Saudi versus Exxon basic case, or Exxon versus Saudi basic case. And it only applies when there's a state court judgment that gives, that has a preclusive effect. That is not the case here. The plaintiffs' FLSA rights were not adjudicated at the time that they were appointed to Senecor. They hadn't even accrued at the time that they were appointed to Senecor. And in fact, the Tenth Circuit just this week reversed the dismissal of an FLSA case brought by participants in a similar drug rehabilitation program. In the Copeland versus Keir case, the Tenth Circuit this week found that state court orders did, quote, did not cause the injuries underlying the plaintiff's wage and hour claims. And thus the Rooker-Feldman doctrine was not applied. But even if the doctrine does not apply, are they, the incarcerated similarly situated to the other patients in the program? The, the, are, are the program participants similarly situated, Your Honor? Yes, they are. For the, for the reasons, for, for some of the reasons I mentioned, Your Honor, they, they all lived at the same facilities. They were all subject to the same policies. They all signed the same paperwork. Senecor wants to cite the paperwork that says, that they sign that says, I'm a beneficiary and not an employee. But they all sign that paperwork. So the issue rises and falls collectively. And, and Alamo explicitly says that FLSA rights can't be abridged by contract or otherwise waived. That same consent to services agreement, and I want to, I want to address the, the quid pro quo issue because it relates to the consent to services agreement states all basic personal needs, including housing, food, emergency medical care, and clothing, would be provided by Senecor. And the intake form that was signed at the same time says that the, the admission into Senecor is based on an ability to participate in all aspects of the program's regimen, including but not limited to participation in the work program. And if unable to participate in the work program, quote, I will be subject to termination from Senecor. These intake documents demonstrate a quid pro quo between the parties. A program participant's receipt of non-monetary benefits was expressly conditioned upon an obligation to participate in the work program. Senecor cites some testimony that says, well, we, we may not have done that. The fact that they were being nice doesn't get them out of this quid pro quo. They had the right and the ability to terminate these people unless they were able to participate in the work, in the work program. That's the quid pro quo. And, and because all of them signed this exact same paperwork, that issue would apply to all members of the collective since all of them signed that paperwork. I want to talk about the primary beneficiary test that's advocated by programs, but even if it were to be applied, it would not prevent certification here. The primary beneficiary test originated from Wally. 40 years later, the Supreme Court decided Alamo. The primary beneficiary test was not used in Alamo and it's equally inappropriate here. Moreover, virtually none of the seven factors that were announced by the second circuit in GLAAD when they announced the application of the primary beneficiary test would have any applicability or relevance in the context of a rehabilitation program. The GLAAD factors focus on formal education, specifically the existence of an integrated coursework, the receipt of academic credit, and the extent to which the internship accommodates the academic calendar. Those have little or no relevance in a drug rehabilitation program. GLAAD recognized this in its opinion when it said the approach we adopt is confined to internships and does not apply to training programs in other contexts. That's from the GLAAD case at page 537. Like the seventh circuit when it decided whether athletes were employees, this court should not apply the primary beneficiary test used in GLAAD because it fails to capture the true nature of the relationship between the alleged employee and the alleged employer. That's from the Berger versus NCAA case. Keep your voice up, please. Keep your voice up. Yes, sir. Will do. But even if the primary beneficiary test were used here, it would not require individualized analysis. The primary beneficiary test is not an outcome-oriented test that asks whether one person achieved a specific result. It does not ask whether one individual became sober or not, nor is it a subjective test that asks what each person expected. The subjective perceptions of the workers are basically irrelevant. That's what a court from the Northern District of California 2010 Harris versus Vector stated. The focus of the primary beneficiary test is on whether the policies and practices of the employer are sufficiently consistent to warrant collective treatment for certification purposes. Here they undoubtedly are because all policies applied equally to all program participants and all of the participants signed the same paperwork. I also want to address the fourth circuit case he put emphasis on. The Armento? Yes, sir. The Armento case. Armento is different for several reasons or I'm sorry. Armento was, the analysis in Armento is improper for several reasons and it's factually distinguishable, your honor. In the Armento case, there were several exemptions that program participants in that program could apply for. There were those that were employed full-time. Those who were employed full-time or were students full-time were not required to participate or were allowed to participate less in a work program. Those with disabilities and those with individualized needs could also apply for exemptions. That is not the case here, so you do not have the same quote-unquote as you do here. Also, it did not have the same the Armento program did not involve the same immediate advantage as is the case here because the Armento case and the same would be true for Phoenix versus Vaughn and the Williams case. Those were in-house positions. The class that we propose to be certified here involves only those who work for third parties. The immediate advantage aspect of this. In Williams, it was at the Salvation Army? He was working in-house, your honor. I see. So, there's not the same immediate advantage where you have these workers being farmed out to third parties. You have revenue being generated as a result of their work and they're not being paid. So, as a result, they're able to offer below market rates. They're able to compete unfairly with other staffing companies and unfair competition is a policy consideration that underlies the FLSA. I also want to address on the on the Senate Court's argument about the subjective beliefs of the workers and why that's why they believe that should prevent certification. Under Alamo, that cannot be the result. In Alamo, there was a differing testimony as to whether the workers should have been paid. Many of the associates stated that they considered themselves to be volunteers when they worked and that they expected no compensation for their labor. One associate testified she did not work for material rewards and none of the other workers expected monetary compensation either. That same associate testified that she considered the work she did for Alamo to be personally beneficial and part of her ministry. The court nonetheless found that all 300 program participants in that case were employees and that the FLSA applied even to protections. Senate Court's argument that the subjective testimony of the workers in this case precludes certification is also foreclosed by this court's decision in Cleveland versus City of Elmendorf. That's found at 388 F3rd 522. It's a 2004 decision. In determining whether an individual was an employee or a volunteer, the Elmendorf court stated that courts should not look at the Instead, courts should consider the objective facts surrounding the services performed to determine whether the totality of the circumstances shows the worker to be an employee or a volunteer, citing Alamo. And then lastly, your honor, I do want to address the affirmative defenses briefly. Senate court asserted 48 different affirmative defenses in response to plaintiff's first amended complaint. It cannot be at the certification stage that a plaintiff is required to guess which defenses an employer might claim could present individualized issues. The unfairness of this requirement is illustrated by the offset issue, which Senate court belatedly raised only at the hearing on the motion for certification. Only at the hearing, never in writing? It was not raised in the briefing on the motion for certification, your honor. They did plead it, but it was not raised in the briefing on the certification motion. If Senate court itself did not seem to believe that the offset defense was important enough to even mention in its response to the motion to certify, it certainly would be unfair to allow the plaintiffs or to require the plaintiffs to affirmative defenses that they raised in their answer in our initial motion to certify. As a result, our position is that it's the defendant's burden to advance and provide evidence showing that a specific affirmative defense makes certification improper and specifically why individual issues related to that defense make common adjudication of that defense unfeasible. Only then would the burden, should the burden shift to the plaintiff to show why the affirmative defense would not prevent collective treatment. And with respect to the Motor Carrier Act, I want to address the offset. I've addressed Rooker-Feldman. I want to address the Motor Carrier Act and offset issue briefly. With respect to the Motor Carrier Act, Senate court provided no evidence that the Motor Carrier Act should apply to any class members. The testimony upon which they relied for the Motor Carrier Act exemption came from Mr. Woods and Mr. Pouncey. That testimony failed to show that either one of them were employed by a DOT carrier, that the motor vehicles they loaded moved in interstate commerce, or that the goods that they were loading moved in interstate commerce, all of which would be required for Senate court to prevail on their Motor Carrier Act defense. As such, the court properly concluded that there was insufficient evidence for the Motor Carrier exemption to apply to any of the class members. With respect to the offset issue, Senate court has never provided any reasonable explanation why an offset for housing, food, and medical care could not be applied using a weekly formula on a per resident basis that could be applied collectively. And it certainly didn't provide any evidence to the court in its certification response showing that offsets should apply on an individual by individual basis or that individual assessments of the offset issue were necessary. And in support of this, our proposal that the court need not address that because they didn't provide evidence. We would cite the True Health case from the Ninth Circuit, a 2018 decision, and the Top Flight case, a Sixth Circuit decision from 2016. All right. Thank you, Your Honor. Thank you, Your Honor. Judge Higginson, I'd like to begin by going directly to something that you were talking to my colleague about in his remarks today. This court cannot affirm Judge Ellison's decision without taking a position on the test that is applied. The reason is because Judge Ellison did not leave this court that freedom. Judge Ellison announced, I will be applying the independent contractor test. I refuse to consider any evidence of subjectivity, despite the fact that a law most says you must consider expectation of compensation versus personal purpose. I will disregard all of that. He has already found in writing that the in-kind benefits were offered in exchange for their labor. He has said, I will decide this collectively, but he did so by deciding to apply a test that is inapplicable and already announcing how he has decided, how he has weighed the evidence in light of that. Under Swales, we're not supposed to leap all the way ahead to the end decision. I understand that a certain amount of wrestling with the issues is necessary, but he's already made clear what's happening. That's why we took this interlocutory appeal, and it's why I hope this court granted that interlocutory appeal, so that we could get some clarity for Judge Ellison now before things get any further. Subjectivity must be part of the analysis. It completely eradicates the whole notion of internships, of trainees, and of drug rehab patients. If you get rid of the idea of asking the worker, why are you here? That has to be part of the question of an employee. Otherwise, you've erased whole swaths of a llama. And furthermore, the majority in Williams got it right. That is a threshold question. Every court of appeals that has addressed this, every one, they have no case that has come out in a different way. Well, you majority tried to say we are adhering to Alamo. It's just in our facts, in-house, it's solely rehabilitative. Correct. But you're not saying this was solely rehabilitative, ain't it? Yes. Well, but your client made millions of dollars from Walmart. More millions. That's offering the services. Okay, but that sounds like payment in kind. You're getting revenue, and then you're paying these patients. I'm not paying the patients, ever. You say we collected millions, and we did. We spent more than that offering these drug rehab programs. We don't ever pay the patients. The patients come here to work for sobriety, to develop sobriety, life skills, life training, to get education, to get a GED, to get medical care, whatever it is we offer. But they're not quid pro quo. It's not an exchange one for the other, which is why all of the circuits that have ever addressed the question have said the two are not offered in exchange, and that's the heart of what Alamo found. It has to be a quid pro quo. Right, but at the same time, agree with me, I mean, this was the dissent in Williams. The Supreme Court squarely foreclosed the expectations of the party's control. And I'm not sure how your subjectivity argument, you know, you start out saying there's a different test, and he erred following, I guess, Hopkins, but he's citing Alamo. Alamo's saying even if they sign, I'm not an employee, that means nothing. Right, and I guess to make it a question, I mean, the court, the Supreme Court has said definition of employees, about as comprehensive as you can get, particularly as to people who lack bargaining authority. And one might say patients in these circumstances, they sign this because they just desperately need the help. But why is it all that backwards? They desperately need the help doing what? They don't need a job, they need sobriety, and that's why they came to Seneca in the first place. The distinction that we're drawing is in Alamo itself. It's not crazy that the circuits have come through and found this, and it works this way. The protections of the FLSA include that you may not waive your right to collect under the FLSA, because otherwise, if you're an FLSA employee, it would motivate employers to use their unequal bargaining power. But if you're not an FLSA employee in the first place, if you never met that standard, if you were truly a volunteer, an intern, a trainee, you fall under Walling versus Portland Terminal, you're not an FLSA employee. You do not have the protections. They never applied in the first place. That's the distinction that we're drawing, and that's what I believe is stated in Williams, and it's also necessarily part of the analysis of everybody that followed the apostate case from the Sixth Circuit, where we have... So what's your best Fifth Circuit case? Donovan. Donovan. This court looked at a group of trainees for American Airlines, did not apply the independent contractor test. It applied... They were only trainees for seven days or something, right? It wasn't seven days. It was a shorter period than here. These people, 16 months? That's correct, which is less than was an alumni, but it's a period based on not a desire to squeeze them for all the labor that they're worth. It's a period of time always determined by the sobriety decisions. What about his in-house third-party distinction? Because it sounds like they are their trainees in-house. Williams, they were in-house. Salvation Army, Armento, they're in-house, but here they're going to Walmart. Why isn't that a pretty powerful distinction? It's not a significant distinction because in either case, somebody is performing work. Their logic would be that everybody that does any work for any reason has to be paid for that work. Why would it matter whether you work in-house or out of the house? Okay, thank you. And if I may answer your earlier question with a citation. Okay, give the citation. You would ask for the citation for that. The judge addressed our offset argument at page 1467 in this order. They responded to our argument at the hearing at page 1703 by saying they didn't think it was a problem. It could be easily calculated. We raised that point... All right, I think you've about 1,600, 1,690, somewhere around there in the record. Part of the record. All right, thank you very much. All right, the court will take this matter under advisement.